**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Nicholas M. Blaszczyk,

                Plaintiff,      Case No. 19-cv-11367

v.                        Judith E. Levy
                            United States District Judge

Gregory B. Darby, et al.,

                            Mag. Judge Mona K. Majzoub

                Defendants.

_____/

**OPINION AND ORDER DISMISSING CASE FOR LACK OF**
**SUBJECT MATTER JURISDICTION**

On May 8, 2019, Plaintiff Nicholas Blaszczyk initiated this action
for declaratory and injunctive relief against Defendants Gregory Darby,
Cruisin' Tikis, LLC, Cruisin' Tikis Transportation Services, LLC,
Cruisin' Tiki Builders, LLC, and Cruisin' Tikis International, Inc. (ECF
No. 1.) The Court ordered Plaintiff to show cause why the case should not
be dismissed for lack of subject matter jurisdiction. (ECF No. 15.) On
September 26, 2019, the Court held a hearing at which the parties
discussed, among other issues, whether a case or controversy exists and

whether the amount in controversy exceeds $75,000. The Court now dismisses Plaintiff's case for lack of subject matter jurisdiction.

## I.    Background

This case involves a commercial dispute between two businesspeople over a summer hospitality enterprise. Defendant Gregory Darby operates a Florida-based family of companies under the name "Cruisin' Tiki." (ECF No. 1, PageID.4.) A Cruisin' Tiki vessel, which combines "common features of a 'tiki bar' with the functionality of a water-worthy vessel" (ECF No. 1, PageID.9), offers a maritime adventure for those "cruising to [their] favorite dockside venue or just hanging with friends for a fun time." Cruisin' Tikis, LLC, https://cruisintikis.com/ (last visited Nov. 13, 2019). In January 2018, Plaintiff entered into a contract (the "Purported Agreement") with Defendant Darby, authorizing Plaintiff to operate Crusin' Tiki vessels in Metropolitan Detroit. (ECF No. 1, PageID.5) Under the agreement, Plaintiff received "an exclusive, non-assignable right and license to operate a commercial charter operation of a CRUISIN TIKI® VESSEL" on "the United States side of Lake St. Clair." (*Id.* at PageID.21, PageID.28.) In exchange, Plaintiff must pay "a fee of 8% of charter revenue derived from using the Cruisin' Tiki® intellectual

property, website, brand name, marketing materials and Charter software applications." (*Id.* at PageID.29.)

Like many business deals, the agreement never fully set sail. In November 2018, Defendants sent Plaintiff an additional 159-page franchise disclosure document. (ECF No. 1, PageID.11). The additional disclosures were not referenced in the original contract. Plaintiff, displeased with the new contractual requirements, sought to terminate the Purported Agreement. (ECF No.1, PageID.12–13.) Counsel for both parties discussed the situation via email in January 2019, but they did not arrive at a resolution. (*Id.* at PageID.12–13.) In May 2019, one or more Defendant companies contacted Plaintiff by email requesting that Plaintiff enter a monthly revenue report, pursuant to the Purported Agreement. (ECF No. 1, PageID.13.)  In response, Plaintiff filed this lawsuit, seeking a declaration that the Purported Agreement violates Federal Franchise Regulations and an injunction preventing Defendants from attempting to enforce it. (ECF No. 1, PageID.15–17.)

Plaintiff alleges that jurisdiction exists under § 1332 because "the parties are completely diverse and the amount in controversy exceeds $75,000.00." (ECF No.1, PageID.5.) However, Plaintiff's theory does not

hold water. Plaintiff's case meets neither the constitutional nor statutory requirements for subject matter jurisdiction.[1] Because Plaintiff's case does not raise a constitutionally sufficient controversy, and—even if the Court were to find such a controversy—the amount in controversy does not exceed $75,000, the Court must dismiss the case.

## II.    Subject Matter Jurisdiction

This Court does not have the power to hear every case brought before it. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress." *Hamama v. Adducci,* 912 F.3d 869, 874 (6th Cir. 2018) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests

---

[1] While not the focus of this order, Plaintiff's complaint fails to allege facts sufficient to show complete diversity. Plaintiff alleges only that Plaintiff "is an individual who resides in Macomb County, Michigan, United States." (*Id.* at PageID.6.) Plaintiff makes no allegations with respect to his own citizenship. An individual is not necessarily a citizen of the place in which that individual resides. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Rather, an individual is a citizen of the state in which that individual is domiciled, as defined by the individual's (1) physical presence within a state; and (2) intent to remain indefinitely. *Id.* Therefore, Plaintiff's allegations are insufficient to show complete diversity between parties.

upon the party asserting jurisdiction." *Hamontree v. United States*, No. 16-6582, 2018 WL 1935935, at *1 (6th Cir. Feb. 1, 2018) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). "It has long been the case that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Grp.*, 541 U.S. 567, 570 (2004) (citing *Mollan v. Torrance*, 22 U.S. 537, 549 (1824)).

It is the Court's unfailing duty to ensure that each case it hears is properly before it. All courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). Challenges to a court's subject matter jurisdiction "may be raised at any time, by any party or even *sua sponte* by the court itself." *Franzel v. Kerr Mfg. Co.*, 959 F.2d 628, 630 (6th Cir. 1992). The parties may neither consent nor stipulate to a court's subject matter jurisdiction where it does not exist. *American Bankers Ins. Co. v. Nat'l Cas. Co.*, No. 2:08–cv–13522, 2009 WL 257699, at *4 (E.D. Mich. Feb. 3, 2009) (citing *California v. LaRue*, 409 U. S. 109, 112 n.3 (1972)).

This suit presents two closely related jurisdictional issues: whether Plaintiff has demonstrated an Article III case or controversy, and if he has, whether Plaintiff's suit involves an amount in controversy greater than $75,000. Neither requirement is met.

## A.    Case or Controversy Legal Standard

Because Plaintiff has failed to demonstrate a case or controversy over which this Court can exercise its jurisdiction, the case must be dismissed.

Article III of the United States Constitution provides that "[t]he judicial power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties . . . [and] to Controversies . . . ." U.S. Const. art. III, § 2, cl. 1. This provision limits federal jurisdiction to actual cases or controversies. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979). For a court to have jurisdiction, an actual controversy must exist both at the time the complaint is filed and throughout the pendency of the suit. *Already, LLC v. Nike, Inc*, 568 U.S. 85, 90–91 (2013).

The Supreme Court first examined the case-or-controversy requirement as it pertains to actions seeking declaratory relief in 1937:

> The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41 (1937) (internal citations omitted). Circuit courts applying *Aetna* over the next seventy years routinely applied variations of a reasonable apprehension of litigation test. The Sixth Circuit held that "in [declaratory judgment actions], a justiciable controversy is made out upon plaintiff's showing of 'any indirect or implicit or covert charge of infringement or threat of suit or any conduct or course of action from which any charge or threat could be inferred.'" *Robin Prods. Co. v. Tomecek*, 465 F.2d 1193, 1195 (6th Cir. 1972) (citing *Goodrich-Gulf Chemicals, Inc. v. Phillips Petroleum Co.*, 376 F.2d 1015, 1019 (6th Cir. 1967)). *See also Norfolk Southern Ry. Co. v. Guthrie*, 233 F.3d 532, 534 (7th Cir. 2000) ("Where a declaratory plaintiff files a complaint in anticipation of litigation by the declaratory defendant, a case or controversy exists if the threat of such litigation is real and immediate."); *Alta Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 227 (D.C. Cir. 2000) (holding that a reasonable apprehension of litigation

was necessary for declaratory judgment claim to be justiciable); *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir. 1992) ("If the defendant's actions cause the plaintiff to have a 'real and reasonable apprehension that he will be subject to liability,' the plaintiff has presented a justiciable case or controversy."). The Sixth Circuit's reasonable apprehension test includes subjective and objective prongs: "The appropriate test is whether the course of action would be regarded by a reasonable [person] as a [threat of suit] and was so regarded by the party seeking declaratory relief." 465 F.2d at 1196.

In 2007, the Supreme Court held that these reasonable apprehension of litigation tests conflicted with the Court's earlier precedents, including *Aetna. Medimmune, Inc. v. Genentech*, 549 U.S. 118, 132 n.11 (2007). The Court addressed the justiciability of a declaratory relief claim brought by a licensee who continued to make payments under an allegedly invalid licensing agreement, thereby eliminating any apprehension of suit, reasonable or otherwise. The Court nevertheless held that a case or controversy existed sufficient to confer subject-matter jurisdiction. *Id.* at 137. The Court relied on its 1943 decision in *Altvater v. Freeman*, noting that "the requirements of a case

or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* at 131 (citing *Altvater v. Freeman*, 319 U.S. 359, 365 (1943)). The Court issued another rendition of the case-or-controversy principles set forth in *Aetna*: "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (citing *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

*MedImmune* did not entirely overrule the reasonable apprehension test. As the Federal Circuit has recognized, "proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy." *Prasco, LLC v. Medicis Pharmaceutical Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008). In 2018, the Sixth Circuit embraced *MedImmune*'s "all the circumstances" test without commenting on its effect on *Robin Products*.

*Hemlock Semiconductor Corp. v. Kyocera Corp.*, 747 Fed. App'x 285, 292 (6th Cir. 2017) (holding that the facts alleged under all the circumstances did not show a case or controversy). *MedImmune partially* abrogated *Robin Products*: a reasonable apprehension of litigation is sufficient but not necessary to show a case or controversy in a declaratory judgment action. However, the *Robin Products'* test may—and in this case, does—still inform *MedImmune's* "all the circumstances" analysis.

Other justiciability doctrines impact case-or-controversy analysis. As the Sixth Circuit explains, the case-or-controversy requirement is at the heart of both standing and ripeness doctrines. *Kardules v. City of Columbus*, 95 F.3d 1335, 1343 (6th Cir. 1996). The Federal Circuit has described *MedImmune's* "all the circumstances" test as the sum of standing, ripeness, and mootness inquiries. *See Caraco Pharmaceutical Labs. v. Forest Labs.*, 527 F.3d 1278, 1290 (Fed. Cir. 2008) (Citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967); and *U.S. Parole Comm'n. v. Geraghty,* 445 U.S. 388, 397 (1980)). In evaluating all of the circumstances of this

case to determine whether it presents a case or controversy, the Court will also examine standing and ripeness.[2]

As the Supreme Court acknowledged in *MedImmune*, these justiciability inquiries frequently "boil down to the same question." 549 U.S. 118, 128 n.8 (2007). Standing requires a plaintiff to show an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal citations omitted). Allegations of past injury do not generate standing to bring a declaratory judgment action; a plaintiff must show "actual present harm or a significant possibility of future harm." *Fieger v. Ferry*, 471 F.3d 637. 643 (6th Cir. 2006) (internal citations omitted). Alleged future harm must be "certainly impending." *Clapper v. Amnesty Intern.*, 568 U.S. 398, 401 (2013). In the context of declaratory judgment actions, ripeness doctrine imposes the same requirement: that the "injury in fact be certainly impending." *In re Bryan*, No. 18-3557, 2019 WL 2489657, at *2 (6th Cir. Feb. 19, 2019) (citing *NRA v. Magaw*,132 F.3d 272, 280 (6th Cir. 1997)).

## B. Case or Controversy Analysis

---

[2] Nothing that has occurred in this case implicates the issue of mootness.

Here, the case or controversy, standing, and ripeness analysis all result in a finding of no subject matter jurisdiction over Plaintiff's case for largely the same reason. Because Plaintiff cannot demonstrate a reasonable apprehension of litigation at the time of filing, he cannot show that litigation is "actual or imminent" or "certainly impending." No other circumstances exist to show a substantial controversy of sufficient concreteness or immediacy. For this reason, the Court lacks subject matter jurisdiction to hear this case.

As an initial matter, Plaintiff's failure to satisfy *Robin Products'* reasonable apprehension of litigation test, though not dispositive, weighs strongly against the existence of a case or controversy. Plaintiff alleges "upon information and belief [that] Defendants assert and insist that Blaszczyk . . . owns or operates 'Cruisin' Tiki® Vessel(s).'" (ECF No. 1, PageID.13.) In particular, Plaintiff alleges that Defendants seek to hold Plaintiff responsible for eight percent of gross revenues from six boats in Michigan. (ECF No. 1, PageID.5.) Plaintiff alleges that "Defendants will continue to assert and enforce their claims and demands for payment as if that were true." (*Id.* at PageID.13.) Plaintiff argues that litigation is upon him, but the Court finds Plaintiff's allegations insufficient to show

actions by an "indirect or implicit or covert . . . threat of suit or any conduct or course of action from which any . . . threat could be inferred." 465 F.2d at 1196.

The sum of Plaintiff's allegations at the time of filing place Defendants in a defensive rather than prosecutorial posture. To demonstrate Defendants' enforcement efforts, Plaintiff includes as exhibits to his complaint two emails from Defendants or Defendants' counsel. In one email, dated January 23, 2019, counsel for Defendants writes to Plaintiff's counsel that "your client began purchasing unauthorized Cruisin' Tiki vessels from one of our client's former licensees in New York, and thus decided to breach its licensing agreement with our client." (ECF No. 1, PageID.36.) Counsel further writes, "It appears your client has purchased six vessels from the former licensee, all of which were unauthorized for sale." (*Id.* at PageID.36.) But while the January 23, 2019 email notes the existence of the six boats in Michigan, it is silent as to whether Defendants will seek to enforce the Purported Agreement with respect to those vessels. In fact, counsel for Defendants writes, "Cruisin' Tiki would prefer to have an open and

honest dialogue about your client's purchases, and hopes to avoid any unnecessary disputes." (*Id.* at PageID.36.)

It is telling that this email was written in response to a December 27, 2018 letter from Plaintiff's counsel. (ECF No. 1-1, PageID.32.) Plaintiff's counsel writes that in light of Defendants' additional franchise disclosures, Plaintiff is "declining to buy a franchise and instead must require a refund of the initial $5,000 'licensing fee' within 30 days." (*Id.* at PageID.33.) To date, this communication represents the only monetary demand made by either party with respect to the Purported Agreement. Read in this light, Defendants' January 23 email represents an attempt to limit Defendants' own potential liability: counsel for Defendants writes that "Cruisin' Tiki makes no representations or warranties and expressly disclaims all warranties regarding the vessels that your client purchased. Cruisin' Tiki cannot certify the sea-worthiness, safety, or reliability of any of the vessels." (*Id.* at PageID.36.).

Four months later, on May 1, 2019, Defendants emailed Plaintiff that "in accordance with your license agreement we are sending this notification for the monthly charter reporting procedure. . . . Reporting is 8% of all gross sales to include cash." (*Id.* at PageID.42.) This email,

however, makes no mention of the details of Plaintiff's operation, the six boats in Michigan, or an intent to bring litigation. It appears to be a form email; it is signed by Defendants' "Executiki" Assistant and is seven lines long. *Id.*

Plaintiff points unsuccessfully to two other alleged enforcement efforts to suggest that a case or controversy exists. First, Plaintiff construes Defendant's Motion to Dismiss Pending Arbitration as an attempt to enforce the Purported Agreement. (ECF No. 16, PageID.229.) Defendants' Motion to Dismiss—filed in response to litigation initiated by Plaintiff—is not an attempt to affirmatively bring Defendants' own suit. In the current litigation, Defendants seek only to enforce the arbitration provision; indeed, Defendants' motion mentions neither boats nor revenues. (ECF No. 10.) Second, Plaintiff points to a September 6, 2019 email in which Defendants request that Plaintiff "submit the charter revenue report as outlined in the signed license agreement" for "May, June, July, and now August 2019." (ECF No. 20, PageID.254). This new evidence cannot retroactively generate subject matter jurisdiction. An actual case or controversy must exist at the time a complaint is filed for a federal court to have jurisdiction. *Already, LLC v. Nike, Inc*, 568

U.S. 85, 90–91 (2013). Defendant's Motion to Dismiss was filed, and the September 6, 2019 email sent, after Plaintiff commenced this suit. Whether these documents show a case or controversy today is irrelevant to whether this Court had subject matter jurisdiction when this case was filed in May 2019.

Plaintiff's filings imagine a different lawsuit—one in which Defendants are suing him for breach of contract. Plaintiff repeatedly refers to claims or demands by Defendants that have not materialized (and may never materialize):

- "There is nothing to support any kind of 'legal certainty' capping Defendants' demands at $75,000 or less." (ECF No. 16, PageID.227)
- The Court's inquiry into jurisdiction "neglects to recognize the actual controversy and asks [Plaintiff] to help prove his opponent's putative damages." (ECF No. 16, PageID.222.)
- "If Defendants have their way . . . they will have 8% of the gross revenues of the six boats." (ECF No. 16, PageID.228).

Regarding the Court's Order to Show Cause, Plaintiff writes that the "issues in the Order are so bound up with the substantive issues that they do not allow for any approach except to proceed forward on the merits." (ECF No. 16, PageID.228.) But the merits of this case revolve around whether the Purported Agreement violates Federal Franchise

Regulations, an issue that could be determined without any analysis of boats or revenues.

The Purported Agreement imposes some affirmative obligations on Plaintiff, but these obligations make Plaintiff's apprehension of litigation no more reasonable. At the Court's September 26 hearing, Defendants' counsel brought to the Court's attention, for the first time, Section 5.1 of the Purported Agreement. (September 26, 2019 Hearing, Transcript at 21.) Under the agreement, "Licensee agrees that it shall, during the Term of this Agreement and any renewal thereof, use its best efforts to promote and market the distribution and sale of such Charter Services in the Territory." (ECF No. 1-1, PageID.22.) Neither party cites to this provision in their filings. The Purported Agreement does not define "Charter Services." It does not mandate that Plaintiff purchase boats, nor does it describe, if Plaintiff were required under the contract to purchase boats, how and from where Plaintiff should do so. Plaintiff has provided no evidence that Defendants intend or have threatened to bring suit for breach of contract for failure to perform.

Plaintiff cannot bring Defendants' claims for them, and any such claims are neither immediate nor certainly impending. Plaintiff has

failed to allege facts that would show a reasonable apprehension of litigation. The evidence does not demonstrate conduct from which a threat of suit may be inferred. While Plaintiff's filing of this lawsuit suggests Plaintiff had a subjective apprehension of litigation, a reasonable person would not read a threat of suit into Defendant's communications prior to May 8, 2019. *Robin Products*, 465 F.2d at 1196.

Under *Robin Products*, this analysis would be dispositive; after *MedImmune*, the Court must consider whether all the circumstances nonetheless demonstrate a controversy. 549 U.S. at 127. They do not. *MedImmune's* rearticulation of declaratory judgment cases and controversies does not loosen constitutional requirements so far as to include the present case. As the Federal Circuit explains, *MedImmune* "did not change the bedrock rule that a case or controversy must be based on a *real* and *immediate* injury or threat of future injury that is *caused by the defendants*—an objective standard that cannot be met by a purely subjective or speculative fear of future harm." *Prasco, LLC v. Medicis Pharmaceutical Corp.*, 537 F.3d 1329, 1339 (Fed. Cir. 2008). Indeed, despite the *MedImmune* plaintiff's lack of apprehension of litigation, the Supreme Court found a controversy because "a claim [had been]

demanded as of right and . . . payment [had been] made, but . . . the involuntary or coercive nature of the exaction preserve[d] the right to recover the sums paid or to challenge the legality of the claim." 549 U.S. at 131 (citing *Altvater v. Freeman*, 319 U.S. 359, 365 (1943)). This case deviates from a traditional anticipation of suit declaratory action in the opposite direction than did *MedImmune*—here, no claims have been demanded as of right, and no payments have been made. Plaintiff presents no circumstance that can support jurisdiction given a lack of reasonable apprehension of litigation. Examining the current case through the jurisdictional lenses of standing and ripeness affirms this conclusion.

### 1. Standing

Plaintiff does not have standing to seek declaratory relief. Plaintiff's pleadings hint at several potential injuries for the purposes of standing, but none withstand judicial scrutiny.

Plaintiff paid Defendants an initial fee of $5000 upon signing the Purported Agreement. (ECF No. 1 PageID.10.) Past injury cannot support standing for declaratory judgment claims, *Fieger v. Ferry*, 471 F.3d at 643, nor does Plaintiff's complaint seek to recover this fee.

Lost revenues also do not give rise to standing here. Plaintiff claims that "Defendants' efforts seek to require [Plaintiff] to take steps to encumber, tie up the usage of, and essentially eviscerate the value of [the six] boats." (ECF No. 1, PageID.5–6.) In Plaintiff's response to this Court's Order to Show Cause, Plaintiff writes that "he does not own or operate those six boats and will not do so unless and until this matter is resolved." (ECF No. 16, PageID.228.) To the extent that Plaintiff abstains from commercial activity for fear of enforcement, any economic loss he suffers is self-inflicted. "[S]elf-inflicted injuries are not fairly traceable" to Defendants' actions and do not give rise to standing. *See Clapper v. Amnesty Intern.*, 568 U.S. 398, 418 (2013).

The alleged future enforcement of the Purported Agreement also cannot create constitutional standing. Because Plaintiff lacked a reasonable apprehension of litigation, he cannot demonstrate this enforcement to be imminent or certainly impending.

### 2. Ripeness

For similar reasons, the case is not ripe for judicial review. The Sixth Circuit in *Kyocera* examined the ripeness of an action seeking declaratory relief from a contract acceleration clause when litigation was

not imminent. 747 Fed. App'x 285. The court found that, even though the defendant had "referenced its rights . . . and invoked them against different buyers," the prospect of plaintiff's liability was too remote to generate a controversy for the purposes of a declaratory judgment action. *Id.* at 292. Specifically, "the chain of contingencies necessary to trigger the contracts' acceleration provisions shows that the controversy here is hardly 'immediate', and that *Kyocera*'s prospective liability under the acceleration provisions is not 'certainly impending'." *Id.* at 292 (citing *MedImmune*, 549 U.S. at 127 and *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409-10 (2013)). Here, Defendants have referenced their rights but have not invoked them against Plaintiff in a concrete way. The parties' communications prior to this suit demonstrate a commitment to finding a non-legal resolution to their disputes. As in *Kyocera*, Plaintiff's liability with respect to the revenue provisions of the Purported Agreement requires a chain of contingencies: Plaintiff would need to own or operate Cruisin' Tiki vessels, Defendants would need to demand revenue payments, Plaintiff would need to refuse, and Defendants would need to sue. Thus, Plaintiff's prospective liability is not "certainly impending," and the case is not ripe.

A 2008 case in which this Court found a case or controversy wanting provides an apt comparison. In *World Religious Relief v. Gospel Music Channel*, a media broadcaster sought declaratory relief that it was not infringing against a television provider through its use of the phrase "gospel music." 563 F. Supp. 2d 714 (E.D. Mich. 2008). Before the plaintiff filed suit, the parties had exchanged a series of letters and engaged in one telephone conversation. *Id.* at 715. Neither party explicitly threatened litigation, though the defendant wrote that plaintiff's advertisement "infringed Defendant's marks and constituted 'violation of both federal and state trademark laws, as well as unfair competition and dilution of Defendant's marks.'" *Id.* The Court's assessment of those facts could very well describe this case:

> At the time of the filing of this litigation, the parties had only exchanged three letters. The prospect of litigation was not mentioned by either party, and Defendant's tone in its letters, while protective of what it perceives to be its legal interests, was certainly not threatening. In fact, from the letters, it appears that Plaintiff became unnecessarily defensive early on, misstating or misinterpreting statements made in Defendant's letters for the sake of this action.

*Id.* at 716. The Court concluded that "the parties' correspondence was insufficient to create an actual controversy, of sufficient

immediacy for conferring jurisdiction." *Id.* at 716. Here too, the exchange between parties prior to filing does not demonstrate a case or controversy. Plaintiff's claim for declaratory relief must be dismissed.

By extension, the Court lacks subject matter jurisdiction to hear Plaintiff's claim for injunctive relief as well. Plaintiff seeks to enjoin Defendants' from attempting to enforce the Purported Agreement, relief which would only be appropriate upon a finding that the Purported Agreement is void. Where an injunction is predicated on a declaratory judgment, as is the case here, standing (or lack thereof) to pursue declaratory relief is dispositive of standing to pursue injunctive relief. *ACLU v. Nat. Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007). Similarly, if a claim for declaratory relief does not present an Article III case or controversy, neither can the corresponding claim for injunctive relief. Plaintiff's case must be dismissed.

## C.    Amount in Controversy Legal Standard

Even if Plaintiff could demonstrate a constitutional case or controversy, this case must be dismissed for failure to satisfy statutory jurisdictional requirements. "The existence of an Article III case or

controversy is not itself enough to open the federal courthouse door. The plaintiff must also show that the court has subject-matter jurisdiction under a relevant statute." *Commodities Export Co. v. Detroit Intern. Bridge Co.*, 695 F.3d 518, 525 (6th Cir. 2012). Plaintiff invokes this Court's diversity jurisdiction under 28 U.S.C. § 1332, which grants federal district courts original jurisdiction over civil actions "where the matter in controversy exceeds the sum or value of $75,000." "Unless the amount in controversy was present on the date the case began, the suit must be dismissed for want of jurisdiction." *Gardynski- Leschuck v. Ford Motor Co.*, 142 F.3d 955, 958 (7th Cir 1998).

In actions seeking declaratory or injunctive relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 560 (6th Cir. 2010) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). Applying this principle, the Sixth Circuit has held that "where a party seeks a declaratory judgment, 'the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation.'" *Freeland v. Liberty*

*Mut. Fire. Ins. Co.* 632 F.3d 250, 253 (6th Cir. 2011) (internal citation omitted). When a plaintiff challenges the validity of a contract, the amount in controversy may include future payments under the contract. *Heyman v. Lincoln Nat. Life Ins. Co.*, 781 Fed. App'x 463, 474 (2019). Mere possibility of future benefit or cost is not enough; any benefit or cost must "flow[] directly and with a fair degree of probability from the litigation, not from collateral or speculative sources." *Kheel v. Port of N.Y. Authority*, 457 F.2d 46, 49 (2d Cir. 1972). While exact precision is not required, the value of declaratory relief must be "sufficiently measurable." *Chrysler Group v. S. Holland Dodge*, Nos. 10-12984, 10-13290, 10-13908, 2015 WL 4429456, at *4 (E.D. Mich. July 20, 2015) (citing *S. Fla. Wellness, Inc. v. Allstate Ins. Co.* 745 F.3d 1312, 1316 (11th Cir. 2014)); *Goldsmith v. Sutherland*, 426 F.2d 1395, 1398 (6th Cir. 1970).

"To defeat diversity jurisdiction, 'it must appear to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628 (6th Cir. 2009) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)). Although plaintiffs often do not seek to recover claimed sums in actions for declaratory relief, the Supreme Court has affirmed the application of the

legal certainty test to object of the litigation analysis. *Hunt v. Wash. State Apple Advertising Com'n*, 432 U.S. 333, 348 (1977); *see also Woodmen of the World v. Scarbro*, 129 Fed. App'x 194, 196 (6th Cir. 2005) (remanding to district court to apply legal certainty test to amount in controversy for action seeking declaratory relief). Here, Plaintiff's complaint mischaracterizes the amount in controversy; the Court finds to a legal certainty that the amount in controversy is zero, and the case must be dismissed.

### D.    Amount in Controversy Analysis

In this case, the object of the litigation is a "Purported Agreement" between the parties. (ECF No. 1, PageID.5.) Applying *Cleveland Housing Renewal Project*, the amount in controversy is the value of the Purported Agreement. 621 F.3d at 560. Applying *Freeland,* that value is to be determined by calculating the value of the consequences to Plaintiff that may result from this litigation.[3] 632 F.3d at 253. Plaintiff seeks

---

[3] While the Sixth Circuit has not formally held whether such calculations should be made from the perspective of a plaintiff or a defendant, *Northup Props., Inc. v. Chesapeake Appalachia, LLC*, 567 F.3d 767, 770 n.1 (6th Cir. 2009), the court has noted that "it is generally agreed in this circuit that the amount in controversy should be determined 'from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect.'" *Smith v. Nationwide Prop. & Cas.*

declaratory relief naming the "Purported Agreement" null and void and injunctive relief prohibiting Defendants from enforcing it. (ECF No. 1, PageID.17.) Applying *Heyman*, the value of the consequences that may result from this litigation is thus the present value of potential future payments that Plaintiff would be obligated to make under the agreement. 781 Fed. App'x at 474. The Purported Agreement grants Plaintiff "an exclusive, non-assignable right and license to operate a commercial charter operation of a CRUISIN TIKI® VESSEL" on "the United States side of Lake St. Clair." (*Id.* at PageID.21, PageID.28.) Plaintiff is required by the agreement to pay "a fee of 8% of charter revenue derived from using the Cruisin' Tiki® intellectual property, website, brand name, marketing materials and Charter software applications."[4] (*Id.* at PageID.29.) The

---

*Ins. Co.*, 505 F.3d 401, 407 (6th Cir. 2007) (quoting *Woodmen of the World v. Scarbro*, 129 F. App'x 194, 196 (6th Cir. 2005)).

[4] Plaintiff's affirmative obligations to "promote and market the distribution and sale of such Charter Services" (ECF No. 1-1, PageID.22) are irrelevant to the amount-in-controversy calculation; neither party attempts to argue otherwise. The value of consequences flowing from judgment cannot include the amount Plaintiff would owe in a breach of contract suit for failure to perform. Making that calculation would require the Court to imagine, from a single sentence with undefined key terms, a hypothetical future lawsuit that may never develop. Any calculated amount would be speculative, *Kheel*, 457 F.2d at 49, and not sufficiently measurable, *Chrysler Group v. S. Holland Dodge*, 2015 WL 4429456 at *4.

question for this Court, then, is how to measure "a fee of 8% of charter revenue," given the facts alleged.

Plaintiff alleges that Defendants seek to enforce the Purported Agreement with respect to gross revenues from "six boats in Michigan." (ECF No. 1, PageID.5) Plaintiff alleges that "Defendants insist that the duration of the Purported Agreement extends for at least another 5 years." (*Id.* at PageID.5.) Plaintiff would measure "a fee of 8% of charter revenue" by projecting fees under the Purported Agreement as applied to the six boats in Michigan. By extension, Plaintiff alleges

> all that is necessary for that fee to exceed $75,000 is that the annual fee average more than $15,000, which equals 8% of $187,000 per year in gross revenues or approximately $32,000 per boat per year. Based upon similar summer hospitality businesses, and upon information and belief, average per-vehicle gross revenues in the relevant market exceed $32,000 per year.

(*Id.* at PageID.6.)

While such a straightforward calculation is tempting in its simplicity, it would be improper to include in the amount in controversy any future payments of a fee of 8% of charter revenue with respect to the six boats in Michigan. Plaintiff does not allege—and in fact denies—ownership of the six boats in Michigan. Plaintiff has not yet paid any fees

or charter revenue from the six boats to Defendants. Nor does it appear from these facts that Plaintiff will ever pay charter revenue fees, regardless of the outcome of this lawsuit. Thus, the Court cannot determine the amount in controversy by projecting revenue payments under the Purported Agreement with respect to the six boats that Plaintiff does not own or operate.

Where other federal courts have calculated the amount in controversy using licensing fees from particular property in similar cases, the contract unquestionably applied to the relevant assets, and one party had paid licensing fees for years prior. In *DAKDT, Inc. v. All Green Acquisition Corp.*, the court addressed the amount in controversy in a dispute over the validity of a twenty-year licensing agreement between two lawn care businesses. No. 1:06-cv-076, 2007 WL 1875536 (D.N.D. June 28, 2007). The plaintiffs had paid licensing fees for nine years before bringing suit. *Id.* at *1. The court determined that the amount in controversy for claims for declaratory relief included the annual licensing fees for the remainder of the agreement. *Id.* at *5. The court noted that "these costs would flow directly from an adverse declaration by the Court and such costs are reasonably calculated based upon past fees and the

life of the licensing agreements." *Id.* In *Eisler v. Medicine Shoppe Int'l,* the court held that the amount in controversy in a case seeking rescission of a licensing agreement between two pharmacies was "the value of the contract between the parties, or, the value of the license fees that the Plaintiffs are obligated by contract to pay to Defendant throughout the term of the Agreement." No. 405-cv-2272, 2006 WL 415953, at *2 (E.D. Mo. Feb. 21, 2006). In that case, the plaintiff had paid licensing fees for eight years before filing suit. *Id.* at *1. The court noted undisputed evidence in the form of an affidavit calculating future fees to find that "a conservative estimate of the value at issue is $163,177.00." *Id.* at *2. In *Barbuto v. Medicine Shoppe Int'l,* the court similarly addressed a claim for declaratory relief regarding the validity of a licensing agreement between pharmacies. 166 F. Supp. 2d 341 (W.D. Penn. Oct. 4, 2001). The plaintiffs there had paid licensing fees for eleven years before filing suit. *Id.* at 343. The court concluded that declaratory relief in plaintiffs' favor "would allow plaintiffs to cease paying MSI licensing fees in excess of $75,000 for the next 8 years." *Id.* at 345.

In each of these cases, the licensing agreement applied without question to the asset described within the licensing agreement. Here,

Plaintiff alleges that the six boats are not relevant to the Purported Agreement. (ECF No. 1, PageID.5.) Plaintiff further alleges that Defendants "errantly believe that [Plaintiff] owns or operates" the boats. (*Id.* at PageID.6.) Plaintiff alleges that in 2018, "Defendants did not charter any boats or provide services to Blaszczyk." (*Id.* at PageID.11.) Plaintiff alleges that "throughout the relevant time period and continuing at least until the filing of this [c]omplaint, Defendants know and have known that Blaszczyk is not chartering any boats from them, and thus there are no 'charter revenues' for Defendants to properly demand from him." (*Id.* at PageID.13.) In response to this Court's Order to Show Cause, Plaintiff made explicit what was suggested in his initial complaint: Plaintiff "does not own or operate those six boats and will not do so unless and until this matter is resolved." (ECF No. 16, PageID.228.)

Thus, the amount of revenue from any boats is currently irrelevant to calculating the amount in controversy in this case. Although Plaintiff provided an affidavit in which he states that "gross revenues of the six boats during the summer season as of August 2019 exceed $400,000, (ECF No. 16, PageID.236), that revenue is not, according to Plaintiff's complaint, attributable to him. Nor had Defendants, at the time of filing,

taken or threatened legal action against Plaintiff with respect to those revenues.

In the only case this Court could find in which a federal court upheld diversity jurisdiction where a party to a licensing agreement had yet to make any payments under the agreement, the contract in question included a guaranteed royalties clause. In *Candor Hosiery Mills v. Int'l Networking Grp.*, the court addressed the value of future royalty payments in a licensing agreement between a hosiery company and licensing-agent. 35 F. Supp. 2d 476, 480 (D.N.C. 1998). Although the plaintiff had not made any licensing payments at the time that the suit commenced, the court relied on the licensing agreement's "guaranteed royalties" and "ample evidence . . . that these guaranteed minimums are in fact a good yardstick for measuring the minimum value of the alleged representation agreements" to find that the amount in controversy requirement was satisfied. *Id.* at 481. By contrast, the Purported Agreement includes no such clause.

Here, "the value of the consequences which may result from the litigation" is zero. *Freeland v. Liberty Mut. Fire. Ins. Co.* 632 F.3d 250, 253 (6th Cir. 2011). If Plaintiff does not own the boats, payments of eight

percent of charter revenues will not flow from this Court's ruling on the validity of the Purported Agreement. If Plaintiff wins, and the Court grants declaratory and injunctive relief, Plaintiff will pay Defendants nothing. If Plaintiff loses, and the Court finds the Purported Agreement to be valid, Plaintiff will pay Defendants eight percent of charter revenues, which amounts to eight percent of nothing. *See Leonard v. Enterprise Rent a Car*, 279 F.3d 967, 973 (11th Cir. 2002) ("The plaintiffs in this case have always been free to refuse to purchase the insurance offered by the defendants. Whether or not an injunction is granted in this case, the plaintiffs will be able to avoid paying for the insurance.")

Plaintiff cites to *Jadair, Inc. v. Walt Keeler Co.* for the proposition that fees of eight percent of gross revenue from the six boats may nonetheless be included in the amount in controversy. *See* 679 F.2d 131 (7th Cir. 1982). There, the Seventh Circuit held that where a plaintiff seeks "a declaration of nonliability as to any and all [of the defendant's claims . . . the amount in controversy must be what [the defendant] could possibly recover." *Id.* at 132. But in *Jadair*, the defendant had affirmatively brought or clearly intended to bring claims. *Id.* ("Keeler says it has additional claims for $9,300 in consequential damages, or for

rescission and restoration of the contract price.") Here, Defendants' claims remain hypothetical. *See Battenfeld Soccer, Inc. v. Amer. Indoor Soccer Ass'n., Inc.*, 02-CV-0041E, 2002 WL 1628067, at *2 (W.D.N.Y. June 6, 2002) (holding that a "potential claim . . . is too speculative to be considered for purposes of determining the amount in controversy").

Because no fees of eight percent of gross revenue from any boats will result from this Court's ruling, no revenues can count towards the amount in controversy. The value of the object of litigation is zero, the amount in controversy is zero, and the complaint must be dismissed for lack of subject matter jurisdiction.

## E. Discretion to Decline Jurisdiction

The Declaratory Judgment Act, 28 U.S.C. § 2201, confers discretionary jurisdiction on district courts to determine the propriety of a request for declaratory relief independent of threshold subject-matter jurisdiction requirements. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). The exercise of this discretion is guided by a five-factor test. *See Grand Trunk W. R.R. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (detailing that inquiry).

Plaintiff does not cite to the Declaratory Judgment Act in his complaint. (ECF No. 1.) He brings his suit under the Florida Deceptive and Unfair Trade Practices Act, which provides that

> [w]ithout regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

Fla. Stat. § 501.211(1). The statutory language speaks neither to a court's power to grant declaratory relief nor to whether such authority would be discretionary.

Because lack of subject jurisdiction mandates dismissal of this case, the Court does not address the question of whether it would have discretion to decline to exercise its jurisdiction over Plaintiff's state law action for declaratory relief.

## III.  Conclusion

For the reasons set forth above, Plaintiff has failed to demonstrate a reasonable apprehension of litigation or pointed to litigation that is imminent or certainly impending, and thus Plaintiff has not shown a case or controversy for purposes of Article III. Because Plaintiff's lawsuit does

not present a constitutional controversy, it follows that the amount in controversy must be zero—a conclusion confirmed by valuing the object of the litigation.

Accordingly, the Court lacks subject matter jurisdiction over this case, and Plaintiff's complaint is dismissed without prejudice.

IT IS SO ORDERED.

Dated: November 26, 2019        s/Judith E. Levy
Ann Arbor, Michigan           JUDITH E. LEVY
                              United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 26, 2019.

                              s/William Barkholz
                              Case Manager